Schulman, J.**
*812 *228 Appellants are the seven adult children of decedent J.D. Williams (Decedent), who died in 2010 of mesothelioma allegedly caused by exposure to asbestos in brakes he purchased from defendant The Pep Boys Manny Moe & Jack of California (Pep Boys), an automotive parts retailer and service provider. In this lawsuit, filed in January 2011, they asserted claims for wrongful death, strict liability, and negligence. The trial court granted Pep Boys' motion for judgment under Code of Civil Procedure section 631.8 on appellants' wrongful death claims on the ground that they were barred by the statute of limitations, and also as to appellants' claim for punitive damages.[1] After a bench trial on the remaining claims, the trial court awarded appellants $213,052 as economic damages, but it found that amount was entirely offset by settlements appellants had entered into before trial with other parties. Appellants appeal from the resulting judgment, contending that the trial court erred in several respects. First, they contend that the trial court abused its discretion in allowing Pep Boys to amend its answer to correct a previously-asserted statute of limitations defense. Second, they contend that the trial court erred in granting Pep Boys' motion for judgment under section 631.8. Third, appellants contend that the trial court erred in failing to award damages for the costs of providing home health services to their father and his wife, Betty Williams. Fourth, they assert that the trial court erred in applying offsets to the award of economic damages based on prior settlements without allocating between the estate claims and the wrongful death claims. Fifth, appellants contend the trial court erred in awarding expert fees to Pep Boys under section 998. We will find merit in the third and fifth grounds, reverse the judgment in part, and remand to the trial court for further proceedings. In the published portion of this opinion, we hold that damages recoverable in a survival action brought by a decedent's personal representative or successor in interest are limited to the loss or damage that the decedent sustained or incurred before death, and do not include " 'lost *229 years' damages" that would have been incurred had the decedent survived. We hold further that a settlement offer under Code of Civil Procedure section 998 in a case in which plaintiffs assert both wrongful death and survival causes of action must be apportioned among such distinct claims.
I. FACTUAL AND PROCEDURAL BACKGROUND[2]
A. Decedent's Exposure to Asbestos, Diagnosis, and Death
After trial, the trial court filed a statement of decision containing the following findings of fact, which are uncontested here:
"Decedent lived most of his adult life in a single family home in Los Angeles with his wife and children. He was a do-it-yourselfer type of guy who rarely sent one of his automobiles into the shop for work. This was especially true when it came to brake repair and replacement. Decedent regularly inspected and when necessary did brake work on his cars by himself and with the help of his three boys."
"Decedent bought auto parts at four different shops in the area: Pep Boys, Chief *813 Auto Parts, Tracks and Crenshaw Auto Parts. He mostly frequented Pep Boys and Chief Auto Parts but Pep Boys was his favorite. Pep Boys sold asbestos-containing brakes during the 1960's through the mid-1980's. From Pep Boys Decedent bought Bendix, EIS and Raybestos brand brakes during this period. Decedent also purchased and installed Wagner brakes. All four brands of brakes during this time period contained asbestos. Pep Boys did not sell Wagner brakes. Chief Auto did not sell EIS or Raybestos brakes but may have sold Bendix. The total number of brake jobs Decedent did himself was 28."
"During the mid-1960's through the early 1980's Decedent's male sons helped him install brakes. This involved helping their father remove old brake materials as well as refreshing brakes which didn't require replacement. All these activities involve brushing brake dust from auto wheel drums, grinding or sanding brake shoes, handling 'core' (old) brake parts and sweeping up brake dust. Any one of these activities alone and certainly all of them taken together resulted in Decedent experiencing multiple exposures to friable asbestos from auto brake parts. In the course of these activities Decedent inhaled asbestos fibers on many occasions."
"To summarize the evidence of Decedent's exposure to friable asbestos fibers is fairly simple. There was evidence that several sources of exposure to *230 friable asbestos all constituted significant factors increasing his risk of contracting mesothelioma." The trial court specifically found that among those sources of exposure were Pep Boys' brake products, which contained asbestos that "exposed Decedent to friable asbestos fibers which he inhaled and which were a substantial factor which increased his risk of contracting mesothelioma."
In April 2010, Decedent was diagnosed with malignant mesothelioma. He died of mesothelioma on July 14, 2010 at the age of 75.
B. The Pleadings
On January 7, 2011, appellants filed their initial complaint for wrongful death and survival (asbestos) against Does One through Seventy-Five. It sought to state causes of action for negligence (survival), strict liability (survival), wrongful death, misrepresentation and/or fraudulent concealment, premises liability, and loss of consortium for defendants' actions in, among other things, selling products containing asbestos, including products used for automotive purposes. The complaint was accompanied by a declaration of Decedent's wife, Betty Williams, dated August 21, 2010, as Decedent's successor in interest and attaching his death certificate; the declaration was signed by Glenn Williams.[3]
On December 6, 2012, appellants filed a first amended complaint for wrongful death and survival (asbestos). Appellants named Pep Boys in the caption and causes of action, together with a number of other defendants. On December 27, Pep Boys filed an answer raising an affirmative defense that the first amended complaint was barred by applicable statutes of limitations, including section 340.2. On March 14, 2013, appellants filed a second amended complaint purporting to substitute Pep Boys as the Fifth Doe. On or about March 22, they filed a third amended complaint.
C. Appellants' Discovery Responses
On May 31, 2011, appellants' then counsel John P. Mason of Clapper, Patti, Schweizer & Mason (the Clapper Patti firm), signed appellants' responses to defendants'
*814 first set of standard interrogatories. Those responses were verified by Glenn Williams on February 24, 2012, and were served on January 16, 2013. The record also contains a second, substantially similar verification by Glenn Williams dated February 8, 2014. In response to an interrogatory regarding Decedent's asbestos exposure outside of his work *231 environment,[4] appellants provided the following detailed response: "Decedent performed brake jobs on personal vehicles he owned. Between approximately the early 1960s and 1980, Decedent performed approximately two to three brake jobs per year on his vehicles. Decedent installed EIS, Bendix, Raybestos, and Red Wing brand replacement brakes. Decedent replaced and installed both drum and disc brakes. Decedent used a wire brush to scrape out the worn out brake shoe lining of drum brakes. Decedent then used compressed air to clean out the brake assembly. Decedent used sand paper on the new replacement brakes before installing them. Decedent purchased replacement brake shoe linings at Pep Boys."
D. Pep Boys' Request for Hearing for Offer of Proof re Statute of Limitations
On January 12, 2015, Pep Boys filed a request for hearing for an offer of proof regarding the application of the statute of limitations to appellants' wrongful death claims. In that pleading, Pep Boys asserted that when appellants filed their original complaint on January 7, 2011, appellants and their attorneys already had actual knowledge that (1) Decedent's illness and death were caused by exposure to asbestos; (2) automotive parts which they observed Decedent use contained asbestos; and (3) the automotive parts were purchased from Pep Boys. Pep Boys took the position that the December 2012 first amended complaint did not relate back to the date of the original filing, and that appellants' wrongful death claims against Pep Boys were time-barred. In the alternative, Pep Boys sought bifurcation of trial for application of its statute of limitations defense. The request for hearing was based on, among other things, appellants' discovery responses, including the standard interrogatory responses and deposition testimony by several appellants, to the effect that before Decedent's death on July 14, 2010, Decedent's doctors told appellants the mesothelioma was caused by exposure to asbestos-containing products. After Decedent's death, some of the appellants conducted research and learned that some of the products Decedent had used, including automotive parts he had purchased from Pep Boys, contained asbestos. Appellants opposed the request. Appellants asserted, among other things, that the request was procedurally improper and that Pep Boys had waived the statute of limitations defense. Pep Boys later filed a trial brief addressing the waiver claim.
*232 E. Pep Boys' Amended Answer and Appellants' Motion for Judgment on the Pleadings
In its answer, Pep Boys asserted a general statute of limitations defense that cited section 340.2, among other statutes. The answer did not specifically cite subdivision (c) of that statute, the subdivision of the statute that specifically pertains to wrongful death actions. In a hearing held *815 on January 23, 2015, nominally the fourth day of trial,[5] Pep Boys orally sought leave to amend its answer to cure that technical defect. The trial court, finding that there was no prejudice to appellants, granted Pep Boys leave to amend its answer. Pep Boys filed that amendment on January 27.
Appellants thereafter moved for judgment on the pleadings as to the statute of limitations and other affirmative defenses asserted in Pep Boys' answer, asserting that the trial court should take judicial notice of Pep Boys' purported admission in discovery that it was not aware of facts to support that defense. Specifically, on June 5, 2014, in response to a form interrogatory asking it to set forth all facts upon which it denied various affirmative defenses, Pep Boys stated, "Plaintiffs generally allege they learned that Decedent's illness may have been asbestos-related as of a date certain and that he could not have learned of this at an earlier date. Plaintiffs' causes of actions may be barred by the stated statute of limitations based upon Decedent's alleged dates of employment and his Social Security records. Pep Boys is not presently aware of any information indicating that the claims are barred by the Statute of Limitations or Laches." Pep Boys opposed the motion on the grounds, inter alia , that a motion for judgment on the pleadings lies only for defects on the face of the pleadings. Because the motion was filed shortly before the commencement of trial, however, the trial court deferred any ruling on it pending the presentation of witness testimony.[6]
F. The Court Trial and Pep Boys' Motion for Judgment Under Section 631.8
A bench trial was held from February 3 to February 23, 2015 before the Hon. Charles F. Haines. During the course of the trial, the court heard testimony (live or, in two cases, by deposition) by 16 witnesses, including all seven appellants, a corporate representative of Pep Boys, and several expert witnesses.
*233 On February 23, 2015, at the close of appellants' case, Pep Boys moved for judgment under section 631.8. The motion sought judgment as to three issues: (1) that appellants' claims were time-barred under section 340.2; (2) that appellants had not offered evidence of fraud, malice, or oppression sufficient to support their punitive damages claim; and (3) that appellants had failed to show that Decedent's exposure to their asbestos-containing products was a substantial factor contributing to his risk of mesothelioma. Pep Boys' motion as to the first issue was based on appellants' trial testimony, which established that they had learned before their father's death that asbestos exposure causes mesothelioma and that some of the automotive parts with which he worked, including brake pads, contained asbestos. It was also based on appellants' signed interrogatory responses. Pep Boys argued that the statute of limitations on appellants' wrongful death claims ran on July 14, 2011, one year after Decedent's death. Because appellants first amended their complaint to name Pep Boys as a defendant on December 6, 2012, Pep Boys argued, their claims were time-barred. Pep Boys also relied on the *816 purported knowledge of appellants' then counsel, the Clapper Patti firm. As to the punitive damages claim, Pep Boys asserted that appellants' evidence failed to show that Pep Boys had anything more than a general knowledge of the hazards of asbestos, and did not rebut testimony by Pep Boys' corporate witness that he first became aware in 1986 that asbestos caused disease in humans.
In their opposition to the motion, appellants asserted that Pep Boys had failed to show that they had knowledge of sufficient facts at the time of filing the original complaint to cause a reasonable person in their position to believe liability against Pep Boys was probable. They also asserted that Pep Boys could not properly assert that position while at the same time denying liability during and after trial. As to their punitive damages claim, appellants asserted there was "overwhelming evidence" that Pep Boys knew it was selling asbestos-containing brake products for decades without warning its own employees or others, and without testing exposure levels. Appellants argued that Pep Boys' conduct in failing to institute safety measures and warnings, despite widespread knowledge of the health hazards posed by exposure to asbestos, constituted "conscious disregard" of those risks.
After a hearing, the trial court denied Pep Boys' motion for judgment as to causation, but granted the motion as to appellants' wrongful death and punitive damages claims. As to the wrongful death claims, the court observed that appellants' May 2011 interrogatory response, together with appellants' trial testimony, "overwhelmingly suggests that by May of 2011 [appellants] were aware that this decedent's disease was caused by an asbestos exposure and that Pep Boys was a probable -- and probable is the standard -- a probable person who is responsible." Because appellants did not name Pep Boys as a defendant until December 2012, the court found appellants' claims barred by *234 the statute of limitations set out in section 340.1, subdivision (c)(1) and/or subdivision (c)(2), based on the following facts: "1) [Decedent] passed away on July 14, 2010; 2) Plaintiffs were aware that [Decedent's] disease was caused by an asbestos exposure and that Pep Boys was a probable person who could be responsible no later than May 2011; and 3) Plaintiffs failed to name Pep Boys as a defendant in this litigation until December 2012."
As to the punitive damage claim, the court found "no evidence that Pep Boys' conduct was malicious, oppressive or fraudulent as is required by [ Civil Code section 3294, subdivision (a).]" The court indicated that it had considered all of the trial testimony, including testimony by expert witnesses and by Joseph Cirelli, Pep Boys' senior corporate spokesman, as well as Occupational Safety and Health Administration (OSHA) regulations issued at various times from 1971 through 1986. The court observed that although those regulations early on found a relationship between asbestos exposure and disease, they also stated that there were permissible levels at which employees could be exposed to asbestos for various activities including refacing brakes, and that a reasonable retailer would view the regulations as being directed mostly at manufacturers rather than retailers of lawful products. The court observed that even if Pep Boys could be charged with negligence for failing to follow manufacturers' warnings, it could not find "even a scintilla of evidence of malice, oppression or fraud ...." It also found that appellants had not established such a basis for an award of punitive damages by the preponderance of the evidence, much less by the applicable clear and convincing evidence standard.
*817 The trial court denied appellants' motions for reconsideration of its order, finding that appellants had not presented any new or different evidence. In particular, it found there was "no direct evidence at all that Defendant acted or failed to act with malice or fraud." Further, the court rejected as unreasonable appellants' contention that malice or fraud could be inferred from indirect evidence. Finally, it stated that it had considered and rejected evidence of Pep Boys' subsequent conduct after Decedent's exposure to asbestos.
G. The Statement of Decision and Judgment
The trial court allowed counsel three court days to present closing arguments before taking the matter under submission. It then issued an order granting partial judgment in favor of Pep Boys, a tentative statement of decision and, after receiving and considering objections from both parties, a final statement of decision.
In its statement of decision, the trial court found Pep Boys liable on causes of action for strict liability for selling a defective product; for failure to warn *235 consumers of the hazards of the defective product; and for general negligence. It awarded damages in the amount of $213,052, including the value of Decedent's employment and Social Security pensions from the date of his retirement through his natural lifespan. However, the court found that Pep Boys was entitled to offset against this recovery the value of good-faith settlements appellants had entered into prior to trial with other parties, which totaled $721,500. These settlements were apparently all lump-sum settlements, without any specific allocation between appellants' claims based on wrongful death as opposed to those based on the survivor's statute (§ 377.10 et seq.). The trial court rejected appellants' position that because there was no allocation in the prior settlements, no offset would be appropriate. Rather, it found that "when a settlement itself contains no allocation between types of damages, the court applies the ratio of economic to noneconomic damages in the jury verdict to the settlement offer offset as well." The court, having dismissed the wrongful death and punitive damages claims, had awarded only economic damages, and therefore found that 100% of the value of the settlement should be offset against the recovery. Finding that "the entirety of Plaintiffs' $213,052 award is wiped out by the $721,500 settlement offset," the court entered judgment that appellants shall take nothing from Pep Boys.
H. Motion to Tax Costs
After the trial court entered partial judgment in its favor on appellants' wrongful death causes of action, Pep Boys filed a memorandum of costs in the amount of $32,542.51. In that memorandum, Pep Boys sought to recover, among other costs, $16,724.10 in expert witness fees it had paid to Michael Graham, M.D. Appellants filed a motion to tax costs, asserting those costs were not recoverable. In response, Pep Boys asserted that it was entitled to recover expert witness fees because before trial, it had served an offer to compromise pursuant to section 998 in the amount of $60,000, which appellants had not accepted. After holding a hearing and receiving further briefing, the trial court denied appellants' motion to strike or tax costs. The court found that a joint section 998 offer to all appellants was proper and did not preclude an award of expert witness fees to Pep Boys as the prevailing party.
This timely appeal followed.
II. DISCUSSION
*818 A.-B.***
*236 C. The Trial Court Erred in Its Damages Award.
Appellants contend that the trial court erred in limiting its award of damages to Decedent's lost Social Security and pension benefits, arguing that the trial court also should have awarded damages for the cost of Decedent's home health care and the home health care damages incurred by his estate in caring for his wife. In response, Pep Boys contends that plaintiffs were not entitled to recover damages for any of those items. Whether a plaintiff is entitled to a particular measure of damages is a question of law subject to de novo review. ( Bermudez v. Ciolek (2015) 237 Cal.App.4th 1311, 1324, 188 Cal.Rptr.3d 820 ( Bermudez ).)
A "survival" action may be prosecuted by the estate's executor or administrator or by the victim's successor in interest. (§§ 377.11, 377.20, 377.30.) The measure of damages recoverable in such an action is supplied by section 377.34, which states, "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." Thus, "under California's survival law, an estate can recover ... the deceased plaintiff's lost wages, medical expenses, and any other pecuniary losses incurred before death ...." ( County of Los Angeles v. Superior Court (1999) 21 Cal.4th 292, 304, 87 Cal.Rptr.2d 441, 981 P.2d 68.)
1. Appellants Were Entitled to Recover the Reasonable Value of Home Health Care Services They Provided to Decedent Prior to His Death.
We start by addressing the recoverability of home health care and other costs, the principal issue raised by appellants. Appellants sought damages for the value of home health care and other household services provided to Decedent before his death by several of his children, of which substantial evidence was presented at trial. The trial court, without explanation,[18] did not *237 award any damages for the value of those services. As Pep Boys effectively concedes,[19] the trial court erred in that regard.
"In tort actions, medical expenses fall generally into the category of economic damages, representing actual pecuniary loss caused by the defendant's wrong." ( Hanif v. Housing Authority (1988) 200 Cal.App.3d 635, 641, 246 Cal.Rptr. 192 ( Hanif ).) "A person who undergoes necessary medical treatment for tortiously caused injuries suffers an economic loss by taking on liability for the costs of treatment. Hence, any reasonable charges *819 for treatment the injured person has paid or, having incurred, still owes the medical provider are recoverable as economic damages." ( Howell v. Hamilton Meats & Provisions, Inc. (2011) 52 Cal.4th 541, 551, 129 Cal.Rptr.3d 325, 257 P.3d 1130.)
California law supplies a special rule where such medical services are gratuitously provided by family members. "It is established that 'The reasonable value of nursing services required by the defendant's tortious conduct may be recovered from the defendant even though the services were rendered by members of the injured person's family and without an agreement or expectation of payment. Where services in the way of attendance and nursing are rendered by a member of the plaintiff's family, the amount for which the defendant is liable is the amount for which reasonably competent nursing and attendance by others could have been obtained. The fact that the injured party had a legal right to the nursing services (as in the case of a spouse) does not, as a general rule, prevent recovery of their value, ...' " ( Hanif, supra, 200 Cal.App.3d at pp. 644-645, 246 Cal.Rptr. 192 [holding that trial court properly awarded reasonable value of 24-hour home attendant care provided by plaintiff's parents]; accord, Rodriguez v. McDonnell Douglas Corp. (1978) 87 Cal.App.3d 626, 661-662, 151 Cal.Rptr. 399, disapproved on other grounds, Coito v. Superior Court (2012) 54 Cal.4th 480, 499, 142 Cal.Rptr.3d 607, 278 P.3d 860 [reasonable value of 24-hour home attendant care provided by plaintiff's spouse].)
This rule applies squarely here. Thus, the trial court erred in failing to award damages for the reasonable value of the medical and other services appellants provided to Decedent before his death.
*238 2. Appellants Were Entitled to Recover Household Services Damages for Care Decedent Would Have Provided to His Wife Prior to His Death, But Not Thereafter.
Appellants also sought damages for the value of home health care damages incurred by Decedent's estate in caring for Decedent's wife, Betty Williams, before she passed away in April 2014. Those claims fell into two periods, before and after Decedent's death, that warrant separate discussion.
The first category consists of the reasonable value of nursing and other services that Decedent would have provided to his wife prior to his death, but was unable to provide due to his illness ("replacement care"). Again, Pep Boys does not contest the recoverability of such damages here. Nor did it below. Such damages are recoverable. (See Civ. Code, § 1431.2, subd. (b)(1) [defining "economic damages" to include "costs of obtaining substitute domestic services"]; CACI No. 3903E ["Loss of Ability to Provide Household Services (Economic Damage)"].) "Generally, household services damages represent the detriment suffered when injury prevents a person from contributing some or all of his or her customary services to the family unit." ( Overly v. Ingalls Shipbuilding, Inc. (1999) 74 Cal.App.4th 164, 171, fn. 5, 87 Cal.Rptr.2d 626 ( Overly ).) Substantial evidence having been presented below that the estate incurred such damages, the trial court shall determine a reasonable amount on remand.
The second category requires more discussion. That consists of the reasonable value of 24-hour nursing care that Decedent would have provided to his wife after his death and before she passed away in 2014, nearly four years later. As appellants explain this claim, "to the extent his children were forced to provide gratuitous *820 home health care and other household services to Betty up to the time of her death, [Decedent's] estate is also entitled to recover those costs as damages since he had been providing those services for his wife before he died." Appellants claim that the reasonable value of such services was over $700,000. The parties disagree as to whether such damages are recoverable. Appellants contend that they are properly recovered as " 'lost years' damages," representing economic losses the decedent incurred during the period by which his life expectancy was shortened; Pep Boys, in contrast, contends that they are not recoverable because they were not "sustained or incurred before death," as required by section 377.34. We conclude that Pep Boys has the better argument.
We start, as we must, with the plain language of section 377.34. " ' "We begin by examining the statutory language because it generally is the most reliable indicator of legislative intent. [Citation.] We give the language its usual and ordinary meaning, and '[i]f there is no ambiguity, then we *239 presume the lawmakers meant what they said, and the meaning of the language governs.' " ' " ( People v. Gutierrez (2014) 58 Cal.4th 1354, 1369, 171 Cal.Rptr.3d 421, 324 P.3d 245.) Section 377.34, as noted, provides in pertinent part that "the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived ...." As one court has observed, Pep Boys' position that damages for lost pension benefits or other losses that occur following a decedent's death are not recoverable appears "consistent with the plain language of section 377.34," since by definition such damages are not " 'loss or damage that the decedent sustained or incurred before death.' " ( Stevens v. Owens-Corning Fiberglas Corp. (1996) 49 Cal.App.4th 1645, 1652, 1654, 57 Cal.Rptr.2d 525 ( Stevens ).)[20]
The same conclusion follows from established canons of statutory construction. The only damages specified by section 377.34 "that the decedent would have been entitled to recover had the decedent lived" are "penalties or punitive or exemplary damages." Under the principle expressio unius est exclusio alterius , " 'the enumeration of things to which a statute applies is presumed to exclude things not mentioned.' " ( People v. Salas (2017) 9 Cal.App.5th 736, 742, 214 Cal.Rptr.3d 885.) By expressly authorizing recovery of only penalties or punitive damages that the decedent would have been entitled to recover had the decedent lived, the Legislature necessarily implied that other categories of damages that the decedent would have been entitled to recover had the decedent lived would not be recoverable in a survival action. (See id. at pp. 742-743, 214 Cal.Rptr.3d 885 [by expressly permitting recovery for expenses incurred to install or increase residential security related to a violent felony, the Legislature by implication did not permit recovery of such expenses incurred related to an offense that is not a violent felony].)
Appellants rely upon Overly, supra, 74 Cal.App.4th 164, 87 Cal.Rptr.2d 626, but it *821 supports Pep Boys' position, not appellants'. Overly was an action for personal injury and loss of consortium resulting from asbestos exposure. The trial court permitted plaintiffs to introduce evidence and seek recovery for "loss of future economic benefits that [Overly] would have earned during the period by which his life expectancy was shortened, i.e., 'lost years' damages, in the form of pension, Social Security and 'household services' benefits." ( *240 Id. at p. 171, 87 Cal.Rptr.2d 626.) The court rejected appellant's argument that plaintiffs were not entitled to recover damages for Overly's prospective earnings during the lost years, holding that such an award is "consistent with relevant authority." ( Id. at p. 172, 87 Cal.Rptr.2d 626.) Neither of the cases it cited, however, was a survival action by an estate or other personal representative. ( Fein v. Permanente Group (1985) 38 Cal.3d 137, 153, 211 Cal.Rptr. 368, 695 P.2d 665 [medical malpractice]; Hurlbut v. Sonora Community Hospital (1989) 207 Cal.App.3d 388, 405, 254 Cal.Rptr. 840 [medical malpractice].) Thus, like Overly itself, neither case involved or decided any issue concerning the damages allowable in such an action by section 377.34. To the contrary, Overly expressly rejected defendant's reliance on Williamson, supra, 23 Cal.App.4th 1406, 28 Cal.Rptr.2d 751, rejecting that decision as "not relevant to this case because this is not 'a decedent's action.' " ( Overly, supra, 74 Cal.App.4th at p. 173, 87 Cal.Rptr.2d 626.)
Appellants' position that they are entitled to recover " 'lost years' damages" thus is unsupported by the plain statutory language, by principles of statutory construction, or by pertinent case authority. It is also inconsistent with the fundamental distinction between survival actions and wrongful death and other personal injury actions. Plaintiffs in personal injury actions may recover not only noneconomic damages (such as pain and suffering), but also future damages-that is, damages for "detriment ... certain to result in the future." ( Civ. Code, § 3283.) Such future damages may include, for example, future medical expenses, loss of future income, and future pain and suffering. (See, e.g., Garcia v. Duro Dyne Corp. (2007) 156 Cal.App.4th 92, 103-105, 67 Cal.Rptr.3d 100 [plaintiff in personal injury action was entitled to recover future medical expenses based on substantial evidence that his mesothelioma, although in remission at time of trial, was reasonably certain to recur].) In survival actions, in contrast, damages are narrowly limited to "the loss or damage that the decedent sustained or incurred before death" (§ 377.34), which by definition excludes future damages. For a trial court to award " 'lost years' damages" in a survival action-that is, damages for "loss of future economic benefits that [a decedent] would have earned during the period by which his life expectancy was shortened" ( Overly, supra , 74 Cal.App.4th at p. 171, 87 Cal.Rptr.2d 626 )-would collapse this fundamental distinction and render the plain language of 377.34 meaningless.
Accordingly, we conclude that appellants were not entitled to recover damages for the value of services Decedent would have provided to his wife, had he survived, because those claims do not represent "loss or damage that the decedent sustained or incurred before death."[21]
*822 *241 D. The Trial Court Did Not Err in Offsetting the Total Amount of Appellants' Pretrial Settlements Against the Judgment.†
E. The Trial Court Erred in Awarding Pep Boys Its Expert Witness Fees Under Section 998.
On December 4, 2014, Pep Boys served an offer to pay appellants $60,000 and waive the costs of its defense in exchange for a dismissal without prejudice of all claims appellants had asserted against Pep Boys. The offer was "contingent upon acceptance by all plaintiffs as it is the intention of Pep Boys to obtain a full and final resolution of all claims asserted by plaintiffs in this matter by way of this offer." It stated, "Plaintiff Glenn Williams ('Plaintiff') is allowed to indicate acceptance of the offer by signing below that the offer is accepted," and provided signature lines for appellant Glenn Williams and for appellants' counsel. Appellants did not accept the offer. Because appellants did not achieve any net recovery, after the credit for the pretrial settlements, the trial court held that section 998 applied and awarded Pep Boys $16,724.10 in expert witness fees. Appellants claim that this was error because the offer was extended jointly, without any apportionment of the amount offered among them or their claims. In view of our decision that the trial court erred in declining to award any damages for home health care services, this issue will be moot, if the trial court on remand enters judgment awarding appellants a net recovery in excess of $60,000. Because we cannot predict the amount of that recovery, however, it is necessary for us to decide the issue. "The application of section 998 to undisputed facts is a legal issue we review de novo." ( Gonzalez v. Lew (2018) 20 Cal.App.5th 155, 160 ( Gonzalez ).)
Section 998 allows for any party in a civil suit to serve a settlement offer to any other party before the commencement of trial.[22]
*242 Section 998, subdivision (c)(1) provides that "[i]f an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition, ... the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses ... actually incurred and reasonably necessary ... during trial ... of the case by the defendant." The burden of demonstrating that the offer is valid under section 998 falls " 'squarely on the offering party.' " ( Sanford v. Rasnick (2016) 246 Cal.App.4th 1121, 1129.)
The general rule is that a section 998 offer to multiple plaintiffs is valid only if it is expressly apportioned among them and not conditioned on acceptance by all of *823 them. ( Meissner v. Paulson (1989) 212 Cal.App.3d 785, 791 ( Meissner ).) The Meissner court reasoned that an unallocated offer to multiple plaintiffs is invalid under section 998 because a party receiving a joint unallocated offer may not be able to prove that he or she obtained a more favorable result at trial. ( Id. at p. 790, citing Randles v. Lowry (1970) 4 Cal.App.3d 68, 74.) However, Meissner did not rest its decision on that ground, focusing instead on the fact that the defendant's offer required both plaintiffs to consent to settlement and to determine between themselves the apportionment. ( Id. at p. 791 ; see Gonzalez , supra , 20 Cal.App.5th at p. 162.) Although the trial court determined that as between the Meissner plaintiffs, defendants could show that one, United Pacific, received a less favorable result, the Court of Appeal nevertheless found the offer invalid as to both. "[N]either party could accept without the consent of the other party. The offer inherently necessitated agreement between the parties as to apportionment between them. Although in this case we can say United Pacific received less than it would have under the offer, permitting such application of section 998 would introduce great uncertainty into this area of the law. Plaintiffs would be required to second-guess all joint offers to determine whether a failure to reach agreement with co-plaintiffs would cause a risk of section 998 costs against them. We believe the Legislature did not intend to place this burden on offerees. To enforce the purpose of section 998, we find as a matter of law only an offer made to a single plaintiff, without need for allocation or acceptance by other plaintiffs, qualifies as a valid offer under section 998." ( Id. at p. 791.)
Cases after Meissner recognize this general rule. "In general, ' "a section 998 offer made to multiple parties is valid only if it is expressly apportioned among them and not conditioned on acceptance by all of them." ' " ( Peterson v. John Crane, Inc. (2007) 154 Cal.App.4th 498, 505 *243 ( Peterson ); accord, Menees v. Andrews (2004) 122 Cal.App.4th 1540, 1544 ["It has long been held that a section 998 offer is effective to shift liability for costs only where the offer was properly allocated as to multiple offerees and was made in a manner allowing individual offerees to accept or reject it."].) "There is an exception to this rule: where there is more than one plaintiff, a defendant may still extend a single joint offer, conditioned upon acceptance by all of them, if the separate plaintiffs have a 'unity of interest such that there is a single, indivisible injury.' " ( Peterson, at p. 505.)[23] For example, parties with such a unity of interest include spouses who suffer an injury to community property. ( Gonzalez, supra, 20 Cal.App.5th at p. 163, citing Vick v. DaCorsi (2003) 110 Cal.App.4th 206, 210-211.)
Pep Boys argues that this case falls within that exception to the general rule, and that the trial court correctly relied upon McDaniel v. Asuncion (2013) 214 Cal.App.4th 1201 ( McDaniel ). There the court held that plaintiffs in a wrongful death action have such a unity of interest. ( Id. at p. 1206.) The court explained that "a wrongful death cause of action is atypical. Under California law, either the heirs or the personal representative on behalf of the heirs may bring a single joint indivisible action for wrongful death. [Citation.] This means that all heirs should join in a single action and there cannot be a series *824 of suits by heirs against the tortfeasor for their individual damages. [Citation.] Any recovery for wrongful death is in the form of a lump sum, i.e., a single verdict is rendered for all recoverable damages. [Citations.] The respective rights of the heirs in any award are determined by the court based on the proportion that the heir's personal damage bears to the damage suffered by the others." ( Id. at pp. 1206-1207.) Accordingly, the court reasoned, "there is no justification for invalidating a joint offer in a wrongful death case on the ground that it may be impossible to determine whether any one party received a less favorable result at trial than that party would have received under the offer. Rather, there is only one verdict to compare to the one joint offer." ( Id. at p. 1208.)
If appellants had asserted only a wrongful death cause of action against Pep Boys, its position would have merit. But they did not. Rather, the pending claims Pep Boys offered to settle in December 2014 also included survival claims for strict products liability and negligence asserted by Glenn Williams on behalf of Decedent's estate. Appellants therefore were not seeking to recover for a single, indivisible injury, as the course of the litigation itself makes clear. The trial court granted Pep Boys' motion for *244 judgment under section 631.8 as to the wrongful death cause of action and entered partial judgment against appellants. However, the case proceeded to trial and an award against Pep Boys (before the settlement offset) on the remaining claims. Under the circumstances, this case falls squarely within the general rule. As McDaniel itself recognizes, "where courts have required apportionment of a section 998 offer made to multiple plaintiffs, the offerees have either had different causes of action against the offeror or the potential for separate verdicts and varying recoveries on a single cause of action." ( McDaniel, supra , 214 Cal.App.4th at p. 1206, italics added.) In such circumstances, "when one offer is made to multiple plaintiffs, the plaintiffs need to agree between themselves as to apportionment before accepting the offer. [Citation.] As the Meissner court noted, permitting such joint offers would introduce great uncertainty in that plaintiffs would be required to second-guess all joint offers to determine whether a failure to reach agreement with coplaintiffs would cause a risk of section 998 costs against them. [Citation.] Thus, a defendant must serve a separate offer on each individual plaintiff. In other words, the defendant must apportion the offer between the plaintiffs." ( Id. at p. 1208.)
Because Pep Boys did not apportion its offer among appellants' distinct claims,[24] its offer was invalid, and the trial court's award of expert witness fees to Pep Boys must be reversed.
DISPOSITION
The judgment is reversed, and the matter is remanded to the trial court for further proceedings in accordance with this opinion.
We concur.
Streeter, Acting P.J.
Reardon, J.

Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

All statutory references are to the Code of Civil Procedure unless otherwise indicated.

Additional facts pertinent to each of the issues are addressed in the discussion, post .

Betty Williams died on April 14, 2014. Glenn Williams was named in the first amended complaint as Decedent's successor in interest.

Interrogatory No. 32 reads: "Was the DECEDENT ever exposed to RAW ASBESTOS or ASBESTOS-CONTAINING MATERIAL(S) outside of the DECEDENT's work environment? If 'yes', please state for each such OCCASION: [¶] a. The circumstances surrounding the exposure; [¶] b. The date(s) and LOCATION; [¶] c. The duration and manner of the exposure; and [¶] d. DESCRIBE THE RAW ASBESTOS or ASBESTOS-CONTAINING MATERIAL(S)."

It appears from the record that trial was originally set to commence on July 14, 2014, and was continued several times, ultimately to January 8, 2015. While the trial court held various pretrial proceedings during January, including finalizing settlements with named defendants, the trial against Pep Boys did not commence with the presentation of witness testimony until February 3, 2015.

As discussed below, the trial court did not rule on the motion, which appellants withdrew during trial. (See note 9, post .)

See footnote *, ante .

From what we can determine, the trial court appeared to accept Pep Boys' incorrect assertion that such damages are recoverable only in a wrongful death action. That assertion was at odds with Pep Boys' express concession below that in a survival action, "Plaintiffs may be awarded loss of household services for the time period of [Decedent's] illness, up until his death."

Pep Boys has not responded to appellants' showing that they were entitled to damages for the reasonable value of such services rendered prior to Decedent's death. Instead, it asserts only that "[t]he trial court's denial of household services subsequent to Mr. Williams' death was correct." (Italics added.)

Stevens declined to decide whether section 377.34 prohibits recovery of lost pension benefits, because the defendant manufacturer had stipulated to an instruction requiring the jury to assess damages for lost pension benefits if it found the manufacturer liable for causing plaintiff's lung cancer and therefore invited any error. (Stevens, supra, 49 Cal.App.4th at pp. 1653-1655, 57 Cal.Rptr.2d 525 ; see also Williamson v. Plant Insulation Co. (1994) 23 Cal.App.4th 1406, 1418, fn. 5, 28 Cal.Rptr.2d 751 (Williamson ) ["We express no opinion as to the proper measure of economic damages incurred during [plaintiff's] lifetime, including the question whether loss of future earning capacity is an element of such damages."].)

The same conclusion would seem to follow as to the trial court's award of damages for the value of Decedent's lost pension benefits and Social Security benefits. However, Pep Boys' challenge to those awards is barred because Pep Boys did not cross-appeal from the judgment. "A respondent who fails to file a cross-appeal cannot urge error on appeal." (Kardly v. State Farm Mut. Auto. Ins. Co. (1995) 31 Cal.App.4th 1746, 1748, fn. 1, 37 Cal.Rptr.2d 612 [plaintiffs who prevailed in bad faith insurance case but were not awarded punitive damages could not challenge trial court's evidentiary rulings during punitive damage phase of trial].) Section 906 provides a limited exception "to allow a respondent to assert a legal theory which may result in affirmance of the judgment." (California State Employees' Assn. v. State Personnel Bd. (1986) 178 Cal.App.3d 372, 382, fn. 7, 223 Cal.Rptr. 826.) Here, Pep Boys has not shown that review of this issue is necessary to determine whether any error was prejudicial as to appellants; thus, "we are not required to decide respondent['s] assertions of error in this respect." (Building Industry Assn. v. City of Oceanside (1994) 27 Cal.App.4th 744, 758, fn. 9, 33 Cal.Rptr.2d 137.)

See footnote *, ante .

Section 998, subdivision (b) states, in relevant part, "[n]ot less than 10 days prior to commencement of trial ..., any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time."

Although one justice dissented in Peterson , she "agree[d] with the majority's statement of the controlling law," including the general rule that a section 998 offer to multiple parties must be expressly apportioned and unconditional, and the unity of interest exception to that rule. (Peterson, supra , 154 Cal.App.4th at p. 516, 65 Cal.Rptr.3d 185 (dis. opn. of Jones, P.J.).)

This court need not enter the debate between the majority and dissenting opinions in Peterson as to whether a single plaintiff who sues in different capacities should be considered one party or multiple parties for purposes of section 998. (See Peterson, supra, 154 Cal.App.4th at pp. 506-513, 65 Cal.Rptr.3d 185 [one party]; compare id. at pp. 516-521, 65 Cal.Rptr.3d 185 [multiple parties] (dis. opn. of Jones, P.J.).) There is no dispute that appellants in their capacity as individual heirs are distinct parties from Decedent's estate, represented by Glenn Williams in his capacity as Decedent's successor in interest.